UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

                Plaintiff,

        - against -

GLOBAL BUSINESS TRAVEL GROUP,
INC. and CWT HOLDINGS, LLC,

                Defendants.
------------------------------------------------------------X

**25 Civ. 215 (JSR) (GS)**

**OPINION & ORDER**

**GARY STEIN, United States Magistrate Judge:**

In this antitrust enforcement action, Defendant Global Business Travel Group, Inc. ("GBT") notified the Government that it was clawing back a number of privileged documents it had inadvertently produced during the pre-complaint investigation conducted by the Antitrust Division of the U.S. Department of Justice ("Antitrust Division"). The Government has moved to compel the production of 20 of these documents (the "Disputed Documents"), claiming that they are not privileged and that, even if they are, GBT waived privilege. (Dkt. No. 105). For the reasons set forth below, the Court **DENIES** the Government's motion to compel with respect to nineteen of the Disputed Documents and **GRANTS** the motion to compel with respect to the remaining Disputed Document.

## BACKGROUND

On March 24, 2024, GBT, the world's largest provider of business travel management services, agreed to acquire Defendant CWT Holdings, LLC ("CWT"), the third-largest provider (the "Proposed Transaction"). (Dkt. No. 1 (Complaint) ¶¶ 1, 4, 6).[1] The announcement of the Proposed Transaction triggered regulatory

---

[1] The facts set forth herein are taken from the parties' submissions on the Government's motion, including the following Declarations: the Declaration of Michael A. Rosengart (Government counsel), dated June 2, 2025 (Dkt. No. 105-2 ("Rosengart Decl.")); the Declaration of Michael L. Weiner (GBT

reviews by both the Antitrust Division and the United Kingdom's Competition and Markets Authority ("CMA"). As is common, the Antitrust Division issued a Second Request to GBT in connection with its review, pursuant to which GBT produced a considerable volume of documents. (Dkt. No. 113-1 ¶ 10).

As part of its response to the Second Request, GBT produced the Disputed Documents to the Antitrust Division on July 31, 2024, with the exception of one Document that was subsequently produced in September 2024. (Dkt. No. 109-9; Tr.[2] at 5:20-24). The Disputed Documents consist mainly of emails between and among Daniel Chang, GBT's Vice President of Mergers & Acquisitions; Chernoh Sallu, GBT's Director of Value Development; and Kanishka de Livera, GBT's Head of Strategy and Sallu's supervisor. (Dkt. No. 105-1; Rosengart Decl. ¶¶ 3-4). None of these three GBT employees (or anyone else copied on the Disputed Documents) is an attorney. (Dkt. No. 105 at 1; Tr. at 39:7-10).

The parties' dispute over the discoverability of the Disputed Documents has its genesis in the following circumstances. In early 2024, as part of his ordinary job responsibilities, Sallu prepared an internal market analysis which culminated in a three-tabbed workbook in Microsoft Excel, dubbed the "April Analysis" by the Government. (Dkt. No. 105 at 2; Rosengart Decl. ¶ 7 & Ex. B; Sallu Decl. ¶ 3). In July 2024, in advocating why the Proposed Transaction did not run afoul of antitrust laws, GBT provided, first to the CMA and then to the Antitrust Division,

---

counsel), dated June 5, 2024 (Dkt. No. 109 ("First Weiner Decl.")); the Supplemental Declaration of Michael L. Weiner dated June 9, 2025 (Dkt. No. 113-1 ("Second Weiner Decl.")); the Declaration of Daniel Chang dated June 9, 2025 (Dkt. No. 113-2 ("Chang Decl.")); and the Declaration of Chernoh Sallu, dated June 9, 2025 (Dkt. No. 113-3 ("Sallu Decl.")).

[2] "Tr. refers to the transcript of the oral argument held on the motion on June 6, 2025.

what the Government describes as "a version of the April Analysis." (Dkt. No. 105 at 2). The Government dubs this version the "Submitted Analysis." (*Id.*).

According to the Government, the Submitted Analysis differs from the April Analysis in certain important respects. In particular, the Submitted Analysis shows that the overall size of the global and multinational ("GMN") market segment of the business travel services industry is higher than the calculation contained in the April Analysis. (*Id.* at 2-3). As a result, the Submitted Analysis suggests that GBT and CWT's combined market share would be significantly smaller than the market share suggested by the April Analysis. (*Id.* at 3). In addition, the "Summaries" tab of the April Analysis, which contained the lower market size calculation, was "omitted" from the Submitted Analysis. (*Id.*).

In May 2025, while preparing for Sallu's deposition in this case, GBT's counsel discovered that GBT had inadvertently produced 54 documents involving Sallu during the Second Request, including the 20 Disputed Documents. (Second Weiner Decl. ¶ 11). On May 15, 2025, GBT sent the Government a letter stating that it had "inadvertently produced privileged material" and requesting that the Government destroy its copies of the 54 documents in question. (Dkt. No. 109-9). The Government sequestered the documents and asked to meet and confer with GBT's counsel to discuss GBT's new privilege assertion. (Dkt. No. 109-11).

Following several meet-and-confer sessions, the Government notified the Court that it would be moving to compel production of the Disputed Documents (Dkt. No. 102) and filed a letter and accompanying declaration from its counsel, Michael Rosengart, in support of its motion on June 2, 2025. (Dkt. No. 105). GBT filed its letter in response, along with a declaration from its counsel, Michael L.

3

Weiner of Steptoe LLP ("Steptoe"), on June 5, 2025. (Dkt. Nos. 107-09). Pursuant to the Court's order (Dkt. No. 106), GBT provided copies of the Disputed Documents for the Court's *in camera* review. (Dkt. No. 110). In addition, GBT attached to the Weiner Declaration several other privileged communications for the Court's *in camera* review that GBT claims provide context for its privilege assertion. (Dkt. Nos. 109-1 to 109-7).

The Court held oral argument on the motion on June 6, 2025, and directed additional submissions from the parties. (Dkt. No. 112). On June 9, 2025, GBT provided its supplemental submission, which included declarations from Chang and Sallu and an additional declaration from Weiner. (Dkt. No. 113). The Government responded in a letter dated June 11, 2025. (Dkt. No. 114).

## DISCUSSION

GBT clawed back the Disputed Documents pursuant to Section 5 of the Stipulated Protective Order entered in this action on February 3, 2025. (Dkt. No. 38; *see* Dkt. No. 109 Ex. 9). Paragraph 52 of the Protective Order provides that the disclosure of any "Investigation Materials" (defined to include, *inter alia*, documents produced during the Antitrust Division's pre-complaint investigation) subject to attorney-client privilege or work-product protection "is not a waiver in this Action," provided that "(a) the disclosure was inadvertent; (b) the Person that disclosed the Privileged Material used reasonable efforts to prevent such disclosure; and (c) the Person that disclosed the Privileged Material promptly took reasonable steps to rectify the error, including following Federal Rule of Civil Procedure 26(b)(5)(B)." (Dkt. No. 38 ¶ 52; *see id.* ¶ 9). These three requirements mirror those of Federal Rule of Evidence 502(b), which governs the issue of inadvertent disclosure of

privileged information based on disclosures made "in a federal proceeding or to a federal office or agency." Fed. R. Evid. 502(b); *see Certain Underwriters at Lloyd's v. Nat'l R.R. Pass. Corp.*, 218 F. Supp. 3d 197, 201 (E.D.N.Y. 2016).

GBT represents that it inadvertently included the Disputed Documents in its Second Request production, which comprised two million documents totaling more than six million pages. (Second Weiner Decl. ¶ 10). GBT further represents that it took reasonable steps to attempt to identify and withhold privileged documents, as indicated by the fact that it created a privilege log with 136,975 entries. (*Id.*). Finally, GBT represents that it did not discover the Disputed Documents were inadvertently produced until May 2025, after which it promptly sent its clawback letter to the Government on May 15, 2025. (*Id.* ¶ 11; *see* Dkt. No. 107 at 3).

Based on the representations of GBT counsel, the Government does not dispute that GBT satisfies the three requirements for clawback in paragraph 52 of the Protective Order and Fed. R. Evid. 502(b). (Tr. at 10:5-24). The Government does, however, dispute that the Disputed Documents are privileged in the first instance. (Dkt. No. 105 at 2, 4). The Government further argues that, even if the Documents are privileged, GBT has waived privilege through its use of the Submitted Analysis. (*Id.* at 4-6). The Court addresses each of the Government's contentions in turn.

### A. Applicability of the Privilege

The attorney-client privilege protects from disclosure "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). "The privilege

protects both the advice of the attorney to the client and the information communicated by the client that provides a basis for giving advice." *Johnson v. J. Walter Thompson U.S.A., LLC*, No. 16 Civ. 1805 (JPO) (JCF), 2017 WL 3432301, at *2 (S.D.N.Y. Aug. 9, 2017).

Typically, communications protected by the privilege consist of direct communications, whether written or verbal, between attorney and client. However, "'in the corporate context, the privilege may extend to communications among non-attorneys if they were made at the direction of counsel to gather information to aid counsel in providing legal services.'" *Mestecky v. N.Y.C. Dept. of Educ.*, No. 13 Civ. 4302 (CBA) (VMS), 2015 WL 13856993, at *2 (E.D.N.Y. Aug. 5, 2015) (quoting *Voelker v. Deutsche Bank AG*, No. 11 Civ. 6362 (VEC), 2014 WL 4473351, at *1 (S.D.N.Y. Sept. 11, 2014)); *see also People's United Bank v. PeoplesBank*, 08-cv-1858 (PCD), 2009 WL 10689492, at *2 (D. Conn. Dec. 28, 2009) ("'[N]umerous courts have held that corporate communications among non lawyers to provide information to counsel or otherwise aid counsel in providing legal advice are eligible for the privilege[.]'" (quoting 27 A.L.R. 5th 76)). The privilege also "protects from disclosure communications among corporate employees that reflect advice rendered by counsel to the corporation." *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 442 (S.D.N.Y. 1995).

The Government advances two arguments as to why the Disputed Documents are not privileged. The Government's primary argument is that, during the pre-complaint investigation, GBT repeatedly represented that the Submitted Analysis was prepared in the "ordinary course" of GBT's business, and that this means the Disputed Documents must also have been prepared in the ordinary course of

6

business and, hence, are not privileged. (Dkt. No. 105 at 4; Tr. at 4:11-18:19). When prompted by the Court at oral argument, the Government also contested whether GBT had satisfied the more traditional criteria for showing that the Disputed Documents were prepared at the direction of counsel for the purpose of rendering legal advice and are thus protected by the privilege. (Tr. at 25:5-26:15; *see* Dkt. No. 114). The Court begins its analysis by examining those criteria.

### 1. GBT's Privilege Assertions

GBT's grounds for its assertion of privilege differ with respect to the first nineteen of the Disputed Documents (Documents 1-19) and the last Disputed Document (Document 20). GBT contends that Documents 1-19 consist of communications between GBT employees sent at the direction or request of GBT's counsel for the purpose of assisting counsel in rendering legal advice to GBT in connection with the Proposed Transaction. (Dkt. No. 107 at 3; Dkt. No. 113 at 2). GBT does not contend that this is the case with respect to Document 20. Rather, it contends that Document 20 is privileged because it consists of communications between GBT employees that reflect advice rendered by counsel to GBT. (Dkt. No. 107 at 3 n.2; Dkt. No. 113 at 2 n.1). The Court will therefore discuss Documents 1-19 and Document 20 separately.

#### a. Documents 1-19

As noted, the privilege may extend to communications between non-attorneys, such as the Disputed Documents here, if those communications were prepared at the direction or request of counsel for the purpose of assisting counsel in rendering legal advice to GBT. Based on GBT's original June 5 submission, the Court had serious doubts, which it expressed during oral argument, as to whether

7

GBT had met its burden of showing that the Disputed Documents were prepared at the direction or request of counsel, particularly with respect to the first thirteen of the Documents, which span the period from April 30 to May 3, 2024. (*See* Dkt. No. 105-1). Not only is no attorney a party to these communications, but the communications make no reference to an attorney (either outside counsel or in-house counsel); bear no "Privileged and Confidential" or similar legend; contain no mention of any legal advice sought or conveyed by an attorney; do not indicate that the information had been requested by, or would be conveyed to, any attorney; and make no mention of the investigations being conducted the U.S. or UK antitrust authorities or any other governmental body. (Tr. at 39:4-41:23).

As set forth in the June 5 declaration from GBT's counsel Michael Weiner, as of April 2024, GBT had retained both Steptoe and Cleary Gottlieb Steen & Hamilton ("Cleary") to represent it in connection with the regulatory review of the Proposed Transaction, and attorneys for these firms had been in communication with the Antitrust Division and the CMA. (First Weiner Decl. ¶¶ 2-3). The Weiner Declaration and its *in camera* exhibits show that attorneys from Steptoe and Cleary were in communication with Chang, GBT's Vice President of Mergers and Acquisitions, about the regulatory reviews from April 29 to May 3, 2024, immediately prior to and during the communications among Chang, Sallu, and de Livera that comprise Documents 1-13. (*Id.* ¶¶ 3-9 & Exs. 1-5). However, as the Court noted at oral argument, despite this temporal proximity, these materials do not make clear that the questions posed by Chang to Sallu, reflected in Documents 1-13, were precipitated by a request or direction from GBT's outside counsel. (Tr. at

44:3-11). The Court further noted the absence of any affidavit from GBT attesting to this fact. (*Id.* at 45:4-11).

In response to the Court's concerns, GBT's counsel candidly acknowledged that there may have been a gap in GBT's proof, which he attributed to the fact that the Government had not raised such an objection in its meet-and-confer discussions with GBT. (*Id.* at 45:12-22). Counsel requested an opportunity to submit affidavits to buttress GBT's privilege assertion, and the Court agreed to give GBT that opportunity. (*Id.* at 50:10-17). Thereafter, on June 9, 2025, GBT submitted supplemental declarations from Weiner, Chang, and Sallu. (Dkt. No. 113).

Having reviewed those declarations, the Court now finds that GBT has met its burden of showing that Documents 1-19, including Documents 1-13, reflect communications made at the request or direction of counsel. Both Weiner and Chang swear that on April 29 and 30, 2024, outside counsel asked Chang to seek out more information from others at GBT concerning market shares for GMN customers. (Second Weiner Decl. ¶¶ 6-7; Chang Decl. ¶¶ 4-5). Chang's inquiries led him to de Livera and, ultimately, Sallu, from whom Chang obtained the information requested by outside counsel. (Chang Decl. ¶¶ 6-10). Chang's "sole purpose in communicating with Mr. Sallu" was "to gather information for GBT's outside counsel to use in connection with the regulatory review of the CWT acquisition." (*Id.* ¶ 8).

Sallu also affirms that when he communicated with Chang (with whom he had not previously interacted at GBT) he knew that Chang's questions "were not related to my ordinary course work on the analysis" and he believed that Chang's questions "related to work for GBT's legal department." (Sallu ¶ 5). During a call

9

on May 2, 2024, Chang explained specifically to Sallu that he was seeking information for GBT's outside advisors, including legal counsel, for use in connection with the regulatory review of the Proposed Transaction. (*Id.* ¶ 6; Chang Decl. ¶ 9). The information that Sallu supplied to Chang was in turn forwarded by Chang to outside counsel. (Chang Decl. ¶ 11; Second Weiner Decl. ¶ 9). Neither Chang nor Sallu disseminated the information provided by Sallu to anyone beyond those who needed to know the information for purposes of the regulatory review of the Proposed Transaction. (Chang Decl. ¶ 12; Sallu Decl. ¶ 8).

GBT's supplemental declarations, together with the other evidence submitted on this motion, amply demonstrate that Documents 1-13 (as well as Documents 14-19) were prepared at the direction of outside counsel to assist counsel in rendering legal advice to GBT.[3] Accordingly, GBT has satisfied its burden of coming forward with evidence showing that Documents 1-19 are protected by the attorney-client privilege, even though no attorney is a party to the communications. *See, e.g.*, *Cuno, Inc. v. Pall Corp.*, 121 F.R.D. 198, 203 (E.D.N.Y. 1988) (finding communications between non-attorneys to be privileged where "it was apparent that the communication from one employee to another was for the purpose of the second employee transmitting the information to counsel for advice" and where they "reflect[ed] the requests and directions of counsel transmitted from one employee to another for the purposes of obtaining the information for counsel on which legal advice was to be presented").

---

[3] Documents 14-19, which are emails (and an attachment) sent between May 6, 2024 and May 8, 2024 (*see* Dkt. No. 105-1), involve follow-up communications between Chang and Sallu in response to additional questions from counsel. These documents (unlike Documents 1-13) explicitly reference requests from GBT's outside advisors.

The Government does not seriously contest GBT's showing. It argues only, and unpersuasively, that the fact that "Mr. Chang was in contact with counsel at this time does not by itself envelope [sic] *all* of his communications and conduct as privileged." (Dkt. No. 114 at 1; emphasis added). That is no doubt true. But *these* communications—Documents 1-19—*are* privileged because they contain information that GBT's counsel asked Chang to obtain to aid in their legal advice to GBT. Therefore, GBT has adequately shown that Documents 1-19 are protected by the attorney-client privilege.

### b. Document 20

As noted, the privilege also protects communications between non-attorneys that reflect advice rendered by counsel to a corporation: "'A privileged communication should not lose its protection if an executive relays legal advice to another who shares responsibility for the subject matter underlying the consultation.'" *Bank Brussels Lambert*, 160 F.R.D. at 442 (quoting *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 518 (D. Conn.), *appeal dismissed*, 534 F.2d 1031 (2d Cir. 1976)). It is on this basis that GBT claims privilege over Document 20. (Dkt. No. 107 at 3 n.2; Dkt. No. 113 at 2 n.1; *see* Rosengart Decl. Ex. I-2 (GBT privilege log stating that the email thread in Document 20 "reflect[s] discussion by GBT employees of legal advice provided by counsel in connection with the regulatory review of the proposed transaction")).

Based on the Court's *in camera* review, however, Document 20 does not contain or reflect any legal advice from GBT's counsel, or any discussion by GBT employees of legal advice provided by GBT's counsel. Document 20 consists of an email exchange between de Livera and Sallu. Chang is not copied on these emails,

11

and neither email references any attorney or advice from an attorney. Nor did GBT provide any other evidence outside the document itself to justify its claim of privilege over Document 20. The declarations submitted by Weiner, Chang, and Sallu do not mention Document 20, nor do the exhibits attached to Weiner's first declaration provide context for Document 20.

In explaining GBT's privilege assertion as to Document 20 at oral argument, GBT's counsel pointed to a line in one of the emails in Document 20 referencing the CMA (the UK antitrust regulator) and claimed that the email discusses work product generated in connection with the regulatory review. (Tr. at 51:1-2, 52:4-7). But the email's reference to the CMA is not sufficient to bring it within the scope of the privilege, nor does the Court's review reveal a reference to any attorney work product in the document. Further, GBT has broadly claimed privilege over the entirety of the two emails that comprise Document 20, rather than seeking to redact any particular portion.

Accordingly, the Court concludes that GBT has failed to carry its burden of showing that Document 20 is privileged.

### 2. "Ordinary Course" Argument

The Court rejects the Government's argument that the Disputed Documents are nonprivileged "ordinary course" documents. It is true that both the April Analysis and the Submitted Analysis are not privileged documents; GBT has never claimed otherwise. But that does not mean that *communications* with, or at the direction of, counsel relating to these analyses are therefore also not privileged. *See, e.g., Am. Civil Liberties Union v. Nat'l Sec. Agency*, 925 F.3d 576, 590-91 (2d Cir. 2019) (explaining that "[t]he attorney-client privilege 'protects communications

rather than information'" and thus the "privilege is not 'lost by the mere fact that the information communicated [between attorney and client] is otherwise available to the public'" (first quoting *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984), and then quoting *United States v. Cunningham*, 672 F.2d 1064, 1073 n.8 (2d Cir. 1982))).

The Government emphasizes that, during the pre-complaint investigation, GBT repeatedly held out (or, as the Government puts it, "tout[ed]") the Submitted Analysis as having been created in the ordinary course of GBT's business. (Dkt. No. 105 at 1-4). For example, the Government points to a December 31, 2024 white paper submitted by GBT and CWT to the Antitrust Division describing "GBT's Ordinary Course analysis" as reflecting the larger GMN market size contained in the Submitted Analysis. (Rosengart Decl. ¶ 22(k) & Ex. G at Part III.C; *see also* Rosengart Decl. ¶¶ 22(a)-(j) (citing other examples)). The Government argues that because GBT described the Submitted Analysis as an "ordinary course" work, "the documents and communications that are associated with its development and refinement must also be ordinary course," *i.e.*, not privileged. (Dkt. No. 105 at 4).

But the Government's assumption that the Disputed Documents necessarily "must" have been prepared in the ordinary course of business is unfounded, and is now refuted by the record. GBT asserts, and has provided sworn declarations establishing, that Documents 1-19 were *not* prepared in the ordinary course of business, but instead were created at the direction of GBT's outside counsel to help counsel better understand Sallu's work. (Dkt. No. 107 at 3; Second Weiner Decl. ¶¶ 7-9; Chang Decl. ¶¶ 7-11; Sallu Decl. ¶ 5 ("I would not have prepared these explanations in the ordinary course of my business.")). Communications for this

13

purpose fall within the attorney-client privilege. *See Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981) (attorney-client privilege protects "not only the giving of professional advice . . . but also the giving of information to the lawyer to enable him to give sound and informed advice"). Nor does the Government provide any authority for its contention that GBT's description of the Submitted Analysis as "ordinary course" work thereby vitiates the privilege that otherwise would attach to communications related to the analysis.[4]

It may have been reasonable for the Government to question GBT's belated claim of privilege over the Disputed Documents given Sallu's involvement with these communications, the fact that no lawyer is a party to the communications, and GBT's characterization of its market-sizing analyses of having been performed in the ordinary course of business. The question has now been answered, however. GBT has substantiated its claim of privilege as to Documents 1-19.

## B. Waiver

"It is well established doctrine that in certain circumstances a party's assertion of factual claims can, out of consideration of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted." *John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003). Courts have found an implied waiver of attorney-client privilege where, *inter alia*, a party places privileged communications "at issue." *In re Cnty. of Erie*, 546 F.3d 222, 228 (2d Cir. 2008)). Under this doctrine, "'[a] party cannot partially

---

[4] The Government cites *OneBeacon Ins. Co. v. Forman Int'l, Ltd.*, No. 04 Civ. 2271 (RWS), 2006 WL 3771010 (S.D.N.Y. Dec. 15, 2006), but that case is inapposite. In *OneBeacon*, the court applied the rule that "documents prepared in the ordinary course of [an] insurer's business (which by its nature, involves claim investigation and analysis) are not protected from discovery" simply because the work was "performed by attorneys." *Id.* at *5-6 (citations omitted).

disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party.'" *Barbini v. First Niagara Bank, N.A.*, 331 F.R.D. 454, 460 (S.D.N.Y. 2019) (quoting *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000)).

However, "simply because privileged information is relevant to a claim or defense in the case does not give rise to an implied waiver; rather, to forfeit privilege, 'the party must rely on privileged . . . [information] to make his claim or defense.'" *Leviton Mfg. Co. v. Greenberg Traurig LLP*, No. 09 Civ. 8083 (GBD) (THK), 2010 WL 4983183, at *4 (S.D.N.Y. Dec. 6, 2010) (quoting *In re Cnty. of Erie*, 546 F.3d at 229); *see also Johnson*, 2017 WL 3432301, at *7 ("the fact that a privileged communication may merely be relevant to a claim or defense is insufficient to forfeit protection"). "Forfeiture of this type is premised on the *unfairness* to the adversary of *having to defend* against the privilege holder's claim without access to pertinent privileged materials that might refute the claim." *John Doe Co.*, 350 F.3d at 304 (emphasis in original). "The paramount consideration is '[w]hether fairness requires disclosure,' which must be determined 'on a case-by-case basis, and depends primarily on the specific context in which the privilege is asserted.'" *Johnson*, 2017 WL 3432301, at *7 (quoting *In re Grand Jury Proceedings*, 219 F.3d at 183).

The Government argues that GBT is using the privilege as both a "sword" and a "shield" by simultaneously relying on the Submitted Analysis while invoking the privilege to resist disclosure of the Disputed Documents. (Dkt. No. 105 at 4-5). *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[T]he attorney-

15

client privilege cannot at once be used as a shield and a sword."). But this argument suffers from a basic flaw: the Submitted Analysis itself is not a privileged document and does not contain or refer to any privileged information. Thus, this is not a case where the party claiming privilege has "partially disclose[d] privileged communications or affirmatively rel[ied] on privileged communications to support its claim or defense and then shield[ed] the underlying communications from scrutiny by the opposing party." *In re Grand Jury Proceedings*, 219 F.3d at 182. In other words, GBT has not used the privilege as a "sword" in the first instance.

In arguing to the contrary, the Government appears to assume that the Submitted Analysis reflects "input" or "attorney work product" from GBT's counsel. (*See* Dkt. No. 105 at 1 (stating that GBT has asserted that the Disputed Documents "contain 'input' into the [Submitted Analysis] provided 'at the request of outside counsel'"); *id.* at 4 (arguing that "if the Submitted Analysis were attorney work product," GBT has waived that protection); *id.* at 5 (arguing that Government should be able "to explore any 'input' into the Submitted Analysis")). But this assumption appears to be based on a misreading of GBT's privilege log, which describes Documents 1-19 as "providing input *from GBT employees* on market analysis at the request of outside counsel in connection with the regulatory review of the proposed transaction." (Rosengart Decl. ¶ 26(e) & Ex. I-1; emphasis added). This is not tantamount to a statement that GBT's *counsel* provided "input" into the Submitted Analysis; rather, it is a statement that Sallu (and others) provided "input" *to counsel* in response to counsel's questions. Nor did GBT, in its pre-complaint advocacy, suggest that the Submitted Analysis reflects advice or input from counsel. To the contrary, insofar as GBT characterized the Submitted

16

Analysis as "ordinary course" work, and stands by that characterization today (Dkt. No. 107 at 1, 4), this suggests that the Submitted Analysis did *not* rely on counsel's advice or input.

The Government's reliance on cases such as *In re Kidder Peabody Securities Litigation*, 168 F.R.D. 459 (S.D.N.Y. 1996), is therefore misplaced. (*See* Dkt. No. 105 at 5-6; Tr. at 9:15-18). The Government cites these cases for the proposition that a corporation "cannot voluntarily submit *work product* to the government to bolster a favorable contention against an investigation while using privilege to shield underlying documents that cast doubt on that contention's reliability." (Dkt. No. 105 at 5; emphasis added). That was true in *Kidder Peabody*, where the corporation submitted to the SEC a draft report prepared by counsel summarizing the findings of counsel's internal investigation, which the court found to be an affirmative use of privileged information that waived privilege as to counsel's underlying interview notes and memoranda. *Kidder Peabody*, 168 F.R.D. at 470-73. Here, by contrast, the Government has failed to show that by providing the Submitted Analysis during the pre-complaint investigation, GBT divulged any work product or other privileged information. *Kidder Peabody* thus is inapposite.

Nor does the fact that GBT characterized the Submitted Analysis as "ordinary course" work in its pre-complaint advocacy support a claim that fairness necessitates a waiver of privilege. As GBT correctly notes (Dkt. No. 107 at 5), the Second Circuit in *John Doe Co.* held that a corporation's factual representations in an advocacy letter submitted to the U.S. Attorney's Office during a grand jury investigation, coupled with the corporation's refusal to turn over its attorney's notes that would enable prosecutors to test the accuracy of those representations, did not

17

give rise to a waiver. *See John Doe Co.*, 350 F.3d at 304-05. If the U.S. Attorney's Office determined that it could not accept the company's representations without seeing the underlying notes, the Second Circuit reasoned, it would simply "refuse to credit those representations." *Id.* Thus, the government did not "run the risk that some independent decisionmaker [would] accept Doe's representations without the government having adequate opportunity to refute them," and hence there was "no unfairness to the government." *Id.* at 305.

So too here, the Antitrust Division was not required to accept GBT's representations about its "ordinary course" analysis, and evidently did not do so. Indeed, and despite having access to the Disputed Documents at that time, the Antitrust Division chose to not credit the market share calculations in the Submitted Analysis and proceeded to file this action. It is thus "impossible to see how [the Antitrust Division was] subjected to any unfairness as the result of its own receipt" of the Submitted Analysis. *See id.* at 304.

While the Government argues that GBT has not foresworn use of the Submitted Analysis at the trial of this action (Tr. at 21:13-17)—and indeed, GBT's counsel declined to do so at oral argument (Tr. at 34:9-13)—that circumstance also does not give rise to a waiver. GBT has not said that it *will* rely on the Submitted Analysis in this case, and contrary to the Government's argument (*see* Dkt. No. 105 at 1 & n.1, 5 & n.4), the mere fact that GBT's Amended Answer disputes the Complaint's market share allegations (without even referencing the Submitted Analysis) does not mean GBT has placed the Submitted Analysis at issue. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14 MD 2542 (VSB) (SLC), 2020 WL 3034792, at *5 (S.D.N.Y. June 5, 2020) (finding no waiver where

challenged party "has not shown that [its adversary], as yet, intends to rely on [allegedly privileged information] to influence a decision maker" in the litigation).

More importantly, even if GBT ultimately does rely on the Submitted Analysis, that would still not suffice to trigger a waiver. Under the Government's own reasoning, what makes GBT's use of the Submitted Analysis unfair is GBT's claim that the Submitted Analysis was prepared in the "ordinary course" of business. If GBT relies on the Submitted Analysis but does not claim it to be an "ordinary course" analysis, then the Government could not plausibly contend it was being placed in the unfair position of having to defend against this claim without having access to underlying documents that might prove it to be untrue. *See John Doe Co.*, 350 F.3d at 304 (type of unfairness that triggers a waiver exists where adversary "ha[s] to defend itself against the privilege holder's claim without access to pertinent privileged materials that might refute that claim") (emphasis omitted).[5]

It is evident that the Government suspects it was deceived or misled by GBT's characterization of the Submitted Analysis as "ordinary course" work. Through its deposition of Sallu, and potentially other witnesses, the Government is free to develop evidence to validate its suspicion. For example, in its June 9 supplemental letter, the Government says it wants to question GBT's witnesses about who modified the April Analysis, how it was modified, why it was modified, and whether it was modified (including the alleged deletion of the "Summaries" tab) before or after outside counsel began asking questions about the analysis. (Dkt. No.

---

[5] This is not to say that if GBT did rely on the Submitted Analysis *and* sought to characterize it as an "ordinary course" analysis, this would effect a waiver as to the Disputed Documents. As noted above, it is hard to see how a representation that the Submitted Analysis was prepared in the ordinary course of business, in and of itself, puts privileged communications at issue. At most, it is an implied representation that counsel was *not* involved in preparing the Submitted Analysis.

19

114 at 1). While the Court is not making any definitive rulings at this time, these questions generally would appear to be proper and to not infringe upon attorney-client privilege. To the extent the witness is unable to answer a question without disclosing privileged communications (for example, why the April Analysis was modified), the witness can so state.

But while the Government may be entitled to show that GBT's "ordinary course" representations were inaccurate or misleading, the Government has not shown an entitlement to access privileged communications to help it make that showing. GBT has not put privileged communications "at issue" merely by making factual assertions with which the Government disagrees. If access to privileged communications were to be permitted whenever a party had reason to believe they might show that its adversary had made a false or misleading statement, the attorney-client privilege—"the oldest and most venerated of the common law privileges of confidential communications," *United States v. Edwards*, 303 F.3d 606, 618 (5th Cir. 2002)—would lose much of its meaning.

## CONCLUSION

For the reasons set forth above, the Government's motion to compel production of the Disputed Documents is **DENIED** as to Documents 1-19 and **GRANTED** as to Document 20. The Clerk of Court is respectfully requested to maintain this Order and Opinion under seal (at the "selected parties" viewing level) pending order of the Court and to close the pending motion at Docket No. 105.

**SO ORDERED.**

DATED:  New York, New York
        June 18, 2025

_____
GARY STEIN
United States Magistrate Judge